## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **PEGGY HAWKINS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-2992-B-(BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact and recommendation.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed March 28, 2012 (doc. 14) and *Defendant's Motion for Summary Judgment*, filed June 26, 2012 (doc. 20). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED in part**, Defendant's motion should be **DENIED in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

## I.  BACKGROUND[2]

### A.    Procedural History

Peggy Hawkins (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  (R. at 74–82.) Plaintiff applied for disability insurance benefits and supplemental security income under Titles II

---

[2]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

and XVI of the Social Security Act on December 19, 2007, alleging disability due to knee problems, back injury, diabetes, high cholesterol, migraines, acid reflux, and asthma beginning April 11, 2007.[3] (R. at 185–86, 199, 505.)  Her application was denied initially and upon reconsideration.  (R. at 88–91.)  She timely requested a hearing before an Administrative Law Judge (ALJ) and personally appeared and testified at a hearing on November 6, 2009.  (*See* R. at 93, 502–03.)  On February 5, 2010, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 74–82.)  The Appeals Council denied her request for review on March 23, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 14–17.)  She timely appealed to the United States District Court pursuant to 42 U.S.C. § 405(g).  (doc. 14.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on September 10, 1957. (R. at 81.)  At the time of the hearing before the ALJ, she was 52 years old.  (R.  at 507.)  She completed the 12th grade and attended college for two years.  (R. at 205, 275.)  Her past relevant work consists of child care worker, retail sales clerk, and bank teller.  (R. at 200, 526–27.)

**2.    Medical, Psychological, and Psychiatric Evidence**

On May 20, 2005, Plaintiff saw Lauri Ballard, M.D., her family physician, for an initial consultation regarding recent chest pain.  (R. at 362.)  She told Dr. Ballard that she had "been under increasing stress in the recent past," experienced "several episodes of chest pressure over the last two weeks," and "felt like her recent chest pressure [was] related to stress."  (*Id.*)  She also experienced "occasional dizzy spells, and occasional hot flashes," and insomnia, which she believed

---

[3]  Plaintiff initially alleged an onset date of December 31, 2004 but she amended that date to April 11, 2007 at the hearing before the ALJ.  (R. at 185, 505.)

were "due to stress." (*Id.*) Her "weight ha[d] been gradually increasing" but she had "no history of previous heart disease." (*Id.*) She had experienced "all over soreness with weather changes" since her motor vehicle accident in December 2004 but had "[n]o specific chronic joint pain." (*Id.*) Her asthma was "[c]urrently … doing well." (*Id.*) Dr. Ballard noted that she was "a pleasant and well-appearing … female who [was] obese." (*Id.*) A physical examination was unremarkable and her lungs were "clear to auscultation bilaterally, [with] no wheezes, rales, or rhonchi." (*Id.*) Dr. Ballard's clinical impressions were chest pain, asthma, strong family history of diabetes, dyspareunia, and gastroesophageal reflux disease (GERD). (R. at 363.) Dr. Ballard recommended "a myocardial perfusion scan for further evaluation." (*Id.*) Plaintiff saw Dr. Ballard again on June 10, 2005 and reported that she was "doing well," her "chest pressure [had] improved over the last few weeks," and "her asthma ha[d] been good." (R. at 360.) Dr. Ballard advised her of "the need for weight loss" and recommended that she exercise and reduce her consumption of simple carbohydrates. (*Id.*)

On July 26, 2005, Plaintiff underwent an exercise stress test "using Bruce protocol" at North Texas Cardiovascular Association. (R. at 357.) She "was able to exercise for 7 minutes reaching 8 METS," during which her heart rate increased from 68 to 152 beats per minute, and her blood pressure increased from 120/80 to 170/80. (*Id.*) The test "was terminated due to fatigue." (*Id.*) She "complained of dyspnea during stress but [experienced] no chest pain." (*Id.*) A resting EKG of her chest "showed normal rhythm with nonspecific T wave abnormalities," "no ST segment changes," and "rare PVCs." (*Id.*) The impression was "[n]ormal myocardial perfusion rest/stress and gated SPECT study." (*Id.*) Plaintiff returned to Dr. Ballard's office the following month to follow-up with a sinus infection. (R. at 354.) Although her sinusitis was improving with medication prescribed at Baylor Hospital, she continued "to have intermittent vertigo" that worsened with

changes in her head position.  (*Id.*)  Dr. Ballard diagnosed her with positional vertigo, hyperglycemia, sinusitis, and asthma, and he advised her to improve her diet.  (*Id.*)  On August 14, 2006, she returned to see Dr. Ballard, complaining of vomiting at least six times in the past week and having increasing pain in her stomach.  (R. at 352.)  She also complained of hot flashes, headache, vision problems, and having difficulty walking.  (*Id.*)  Dr. Ballard found that her GERD had worsened and prescribed medication.  (*Id.*)

On September 7, 2006, Dr. Freeze examined Plaintiff upon a referral from Dr. Ballard.  (R. at 349.)  Plaintiff explained that she felt "a general pulling sensation" in her "lower abdomen area" and her legs felt "like [it was] hard to walk in mid thigh to knee area."  (*Id.*)  Dr. Ballard recommended that she undergo a colonoscopy during a subsequent consultation but she declined because of the expense.  (R. at 347.)

On November 2, 2006, Plaintiff returned to Dr. Ballard's office, complaining of severe back pain during the past two weeks.  (R. at 346.)  Her pain was primarily in her low back, radiated down both legs to her feet, and caused her difficulty ambulating.  (*Id.*)  She had no numbness or weakness in her extremities.  (*Id.*)  Dr. Ballard noted that she walked with a limp and found that she had tenderness in her lumbar spine and sacrum.  (*Id.*)  She diagnosed her with acute chronic back pain and "radiculopathy."  (*Id.*)

Plaintiff saw Dr. Ballard again the following week because her medications were not relieving her pain.  (R. at 344.)  She told Dr. Ballard that she worked at a daycare where she "ha[d] to lift small children."  (*Id.*)  Despite her decreased sensation in her legs, she could perform sitting straight leg raises.  (*Id.*)  Dr. Ballard determined that her lumbar radiculopathy was not improving, prescribed her a different medication for her arthritis, and ordered a Magnetic Resonance Imaging (MRI) exam and X-rays of her back and right knee.  (*Id.*)  On November 11, 2006, Dr. Ballard wrote

a letter to Plaintiff's employer excusing her from work for two weeks and explaining that she could not lift more than 10 pounds. (R. at 343.)

The MRI of Plaintiff's back taken on November 11, 2006 revealed degenerative disc changes at the L4/5 and L5/S1 levels with facet changes causing "mild to moderate bilateral neural foramen stenosis with some degree of nerve root impingement." (R. at 337.) "There [was] a normal lumbar lordosis and alignment" and "no spondylolysis," the "conus medullaris [was] normal," and the "bone marrow signal and paraspinal soft tissues [were] unremarkable." (*Id.*) X-rays of her knees taken on November 14, 2006, showed that she had "no fracture, dislocation, or joint effusion" and her "joint space [was] preserved." (R. at 339.) The final impression was a "[n]egative view." (*Id.*)

On December 11, 2006, Plaintiff told Dr. Ballard that the pain in her right knee was not improving with conservative care. (R. at 335.) The pain was so severe that she went to the emergency room in late November and was issued crutches. (*Id.*) Her weight of 234 pounds had not changed since her last office visit. (*Id.*) Dr. Ballard diagnosed her with lumbar radiculopathy, neural foraminal stenosis at L5-S1, and right knee pain and weakness. (*Id.*) She prescribed her medication for her lumbar radiculopathy, referred her to an orthopedic surgeon and a neurosurgeon, and extended her release her from work until January 2007 due to her limited mobility. (*Id.*)

The MRI of Plaintiff's right knee on December 15, 2006, showed that the "anterior and posterior cruciate ligaments … [and] the medial and lateral collateral ligaments [were] intact." (R. at 328.) There was "medial joint space narrowing and subchondral erosions involv[ing] the anterior and central medial tibial plateau consistent with grade IV chondromalacia," "peripheral migration of the anterior horn and body of the medial meniscus," "moderate joint effusion with inflammation and/or edema in the prepatellar subcutaneous issues," "a large complex and large elongated 2x5 [centimeter] Baker's cyst," and "[p]artial rupture." (*Id.*) The lateral menisci were intact, the lateral

- 5 -

and patellofemoral compartments were unremarkable, the patella was normaly aligned, and the retinacula, quadriceps, and patellar tendons were intact.  (*Id.*)

On December 19, 2006, Plaintiff saw James A. Moody, M.D., a neurosurgeon, for an initial consultation.  (R. at 326.)  She told Dr. Moody that she had "been having significant back problems for several months."  (*Id.*)  Her pain began in October 2006, when she injured "moving things in the classroom."  (*Id.*)  She had also experienced intermittent back pain since her automobile accident in December 2004.  (*Id.*)  Her lower back pain was sharp and extended "into her right heel and both feet."  (*Id.*)  The pain in her right knee was constant and worsened when she lay down.  (*Id.*)  She used a cane in her right hand.  (*Id.*)  Dr. Moody explained that he "did not have any results" of her November MRI, and he was "not an orthopedic surgeon."  (*Id.*)  He noted that her main complaints were "back pain, leg pain, [and] knee pain."  (R. at 327.)  He found that her speech was "completely normal," her face was "symmetric," her pupils were "intact," her hearing was "normal," her neck was "supple," her upper extremity motor, sensory, reflex, and coordination were "within normal limits."  (*Id.*)  He noted that her back pain increased with hyper-extension; she could flex, "but this [was] limited primarily by her body girth"; she could bend laterally and twist; and she was "easily able to stand on  her heels [and] toes, and squat."  (*Id.*)  Her sitting straight leg raises were "unremarkable," her knee reflexes were "symmetric, 1+," her ankle reflexes were "symmetric, 1+," her sensation to pinprick [was] normal, her individual motor testing in the sitting position was "normal," and she did "not have [any] neurologic[al] deficit[s]."  (*Id.*)

Dr. Moody reviewed the MRI of her lumbar spine from November 11 and found she had "degenerative disc disease at L4-S and L5-S1," "moderate bilateral neural foraminal narrowing at each level, which clearly could result in nerve compression," and "no evidence of central stenosis."  (*Id.*)  He opined that her "major problem" was her obesity, which could be the cause of "significant

back troubles and knee troubles," and she needed "to get the weight off." (*Id.*)  He told her she "could return to work in about a two-week period" but "should not lift the children for six weeks upon [her] return." (*Id.*)  He found her current medications to "be adequate for her," informed her about steroid injections, which he did not recommend "in view of her heavy weight status," and told her that she "simply need[ed] to lose weight." (*Id.*)  In late January, Dr. Ballard released her to return to work with instructions not to lift the children for six weeks.  (R. at 325.)

On February 5, 2007, Plaintiff saw Phil Berry, M.D., of Texas Orthopaedic Surgical Associates, for an initial consultation.  (R. at 323.)  She complained of pain in her right knee and explained to Dr. Berry that she hit "both knees on the dash" in her 2004 automobile accident and injured her right knee again in October 2006.  (*Id.*)  She felt considerable pain when bearing weight, climbing and descending stairs, and squatting.  (*Id.*)  A physical examination revealed that she had a bow-legged deformity in her right knee with crepitus and tenderness.  (*Id.*)  Weight bearing X-rays showed she had medial compartment osteoarthritis, osteophytes, and virtually no space in the medial compartment.  (*Id.*)  Dr. Berry gave her samples of Celebrex and advised her that a steroid injection might be necessary if her pain did not improve.  (*Id.*)  She saw Dr. Berry again on February 26, 2007, and reported that her knee "did well with Celebrex," but it was "swollen and painful" that day. (R. at 386.)  She also felt "bilateral heel pain in the back of the heels with some burning pain." (*Id.*)

Plaintiff visited Dr. Ballard on February 28, 2007, for a follow-up with her right knee pain, diabetes, and dyslipidemia.  (R. at 321.)  She told Dr. Ballard that her knee and back were "feeling better" and "she [was] much better" after a steroid "injection in the knee." (*Id.*)  That day, she was also experiencing left-sided pain that radiated from her flank around to her front abdominal area. (*Id.*)  She checked her blood sugar level consistently and took Metmorfin regularly.  (*Id.*)

Plaintiff returned to Dr. Berry's office on March 26, 2007.  (R. at 318.)  Although her right knee felt "better" after the steroid injection he administered on her previous visit, she complained that she could not "do her work with kids sitting on the floor."  (*Id.*)  Dr. Berry wrote a note to her employer explaining that she could not work and ordered a copy of the MRI of her knee.  (*Id.*)  During a follow-up consultation on April 30, 2007, she told Dr. Berry that she needed "to change jobs and get a sitting job" because of her "heel pain."  (R. at 314.)  Dr. Berry added "plantar fasciitis of both heels" to his diagnoses, in addition to her osteoarthritis of the knees.  (*Id.*)

On May 15, 2007, Reliance Standard Life Insurance Company (Reliance) requested a statement from Dr. Ballard, Plaintiff's primary care physician, about her ability to work in relation to her recently-filed disability claim.  (R. at 315.)  Dr. Ballard submitted her statement on May 25, 2007, stating that Plaintiff had a "history of lumbar radiculopathy, lumbar degenerative joint disease, and severe osteoarthritis of the right knee."  (R. at 316.)  She opined that Plaintiff had "a Class 4 moderate limitation of function" and was only "capable of [performing] clerical or administrative (sedentary) activity."  (*Id.*)

On June 19, 2007, Plaintiff presented to Parkland Health Hospital (Parkland) to undergo laboratory testing regarding her diabetes and to refill her medications.  (R. at 428–35.)  She returned on August 9, 2007, and was examined by Shobna Katkuri, M.D., a Parkland physician.  (R. at 279, 416–19.)  She was diagnosed with diabetes mellitus type II, asthma, degenerative joint disease, lumbar spondylosis at L4/5 and L5/S1 with foriminal stenosis, and bilateral plantar faciitis.  (R. at 279.)  She returned on September 10, 2007, for a follow-up and a medication refill.  (R. at 414–15.)

On September 25, 2007, Plaintiff saw David Farris, Ph.D., a Parkland psychologist, for an initial psychological examination.  (R. at 453.)  He noted the reason for the referral as "stress management."  (*Id.*)  She reported feeling "overwhelmed" by her life problems and explained that

- 8 -

she stopped working in April 2007 because she had problems with her health.  (*Id.*)  She told him

she needed to "get out of [her] marriage" because her husband was an alcoholic.  (*Id.*)  She had been

the primary caregiver for her mother and aunt, both of whom were now deceased.  (*Id.*)  She was

divorced and later remarried, but her current marriage was also problematic.  (*Id.*)  She did not "feel

as per se depressed, … [but] overwhelmed."  (*Id.*)

In his mental status examination, Dr. Farris noted that Plaintiff was "friendly on greeting,"

and she stated having been treated by him in 2000 following her witnessing an armed robbery.  (R.

at 455.)  He found she was alert, cooperative, calm, congruent, and oriented to person, place, time,

and situation; her speech and attention were normal; her thought processes were goal-oriented; her

judgment was intact; and she denied suicidal and homicidal ideations.  (*Id.*) He noted her "good

prior work [history]" and opined that she could assess her own needs and recognize her personal

traits that needed examination or change.  (*Id.*)  He diagnosed her with "adjustment disorder" and

noted she had an extensive medical history and "recent stressors."  (R. at 456.)  He recommended

a four to six-month counseling treatment.  (R. at 457–58.)

On February 19, 2008, Ingrid Zasterova, M.D., a consultative medical examiner for disability

determination services, examined Plaintiff and completed a medical evaluation.  (R. at 304–08.)

Plaintiff told Dr. Zasterova that she began experiencing pain in right knee in 2004, following a

motor vehicle accident.  (R. at 304.)  She had "increasing swelling" in her right knee and

experienced significant pain in her low back and right leg.  (*Id.*)  The pain in her mid-low back

radiated to the right leg more than the left. (R. at 305.) Dr. Zasterova noted Dr. Moody's diagnosis

of "degenerative disk disease at L4–L5 and L5–S1, moderate bilateral neural foraminal narrowing

at each level probably resulting in nerve root compression." (*Id.*)  She also noted "[t]here were no interventions on her back like injections and no major physical therapy performed." (*Id.*)

Plaintiff told Dr. Zasterova that her asthma began in her childhood, and she was hospitalized once because of it. (*Id.*)  She currently managed her symptoms with a nebulizer that she used once a week and inhalers that she used daily. (*Id.*)  Because her asthma was not progressive, she did not need to treat it with steroids. (*Id.*)  She could "climb up very slowly [one] flight of stairs and walk maybe 10 feet, but that [was] mainly limited by her knee pain." (*Id.*)  She had been diagnosed with diabetes mellitus a year and a half before Dr. Zasterova's examination. (*Id.*)  She had an ophthalmological examination the previous year that was  "normal." (*Id.*)  "She [had] no nephropathy, no neuropathy, and no coronary artery disease." (*Id.*)  Her blood sugar ranged between 120 and 228, and she controlled it with Metformin. (*Id.*)  "Her acid reflux [had] been increasing with her weight, and it [was] worse since the last 5 years, and she [was] using Nexium successfuly for that... [but] [o]therwise she [was] in good health." (*Id.*)

Plaintiff measured 63 inches and weighed 223 pounds. (R. at 306.)  Dr. Zasterova found that she was pleasant and "not in acute distress." (*Id.*)  She had a full range of motion in her extremities, except for her right knee, and had no clubbing, cyanosis, or edema. (*Id.*)  Dr. Zasterova  noted "palpatory tenderness in the medial aspect of the right knee and on the fossa." (*Id.*)  Her knee had "normal configuration" but showed 4+ crepitus and a positive McMurray's sign, indicating meniscus tear. (*Id.*)  Dr. Zasterova found that her "left knee [had] [a] full [range] of motion, no palpatory tenderness, 3+ crepitus, and no other abnormalities." (R. at 307.)  "She [had] a normal station and her gait [was] slow and antalgic." (*Id.*)  She could take "a few steps with toes and heels and tandem," "squat only a few degrees and raise herself unaided," and "move around the room without

assistive devices." (*Id.*) Her "[f]ine and dextrous finger control [was] intact" and she had "no atrophy" in her extremities. (*Id.*) Her sitting straight leg raise was "negative supine and seated bilaterally," she had "no sensory deficits," and her cranial nerves were intact. (*Id.*) Dr. Zasterova found that X-rays of her right knee showed "[m]uch diminished intra-articular space of the tibial aspect of the knee," "a 3 x 8 [millimeter] ossification in the fossa adjacent to the tibial condyle," and degenerative changes, but no fractures or dislocations. (*Id.*) Dr. Zasterova's clinical impressions were obesity; history of asthma (currently controlled with medications); type II diabetes mellitus (not ideally controlled) with no target organ damage; degenerative disease of the lumbar spine with no evidence of radiculopathy; suspect internal derangement of the right knee, acute, and symptomatic; and acid reflux (controlled with medication). (*Id.*)

On March 6, 2008, Yvonne Post, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical evidence and assessed her physical Residual Functional Capacity (RFC). (R. at 295–301.) She opined that Plaintiff had the following physical RFC: lift 20 pounds occasionally and 10 pounds frequently; stand and walk for at least two hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight; and no postural, manipulative, visual, communicative, or environmental limitations. (R. at 296–99.)[4] She acknowledged Plaintiff's "allegation[s] of knee problems, knee injury, diabetes, high cholesterol, migraine[s], [and] asthma." (R. at 297.) She noted her weight was 233 pounds, her height was 63 inches, and her Body Mass Index (BMI) was 41. (*Id.*) She found that her asthma, diabetes mellitus, and acid reflux were controlled with medications and there was "no evidence of radiculopathy" in her back. (*Id.*) Dr. Post also noted Dr. Zasterova's observations that Plaintiff had a slow and

---

[4] On May 1, 2008, Frederick Cremona, M.D., another SAMC, reviewed Dr. Post's RFC assessment and the evidence of record, and "affirmed" Dr. Post's RFC findings. (R. at 271.)

antalgic gait, walked with a cane, and could ambulate without assistive devices. (*Id.*) Lastly, Dr. Post noted Dr. Zasterova's findings that she had a decreased range of motion in her right knee as well as "diminished intra-articular space of the tibial aspect of the knee [and] degenerative changes." (*Id.*)

On April 29, 2008, Horace A. DeFord, M.D., a psychological consultant for disability determination services, interviewed Plaintiff and completed a mental evaluation. (R. at 273–78.) Plaintiff arrived to the consultation with her husband. (R. at 273.) Dr. DeFord observed that she was "a 50 year old" obese woman "who appeared [her] stated age," "used a cane, and walked with a limp." (*Id.*) She was "the primary informant" but "[h]er reliability was compromised by multiple somatic concerns." (*Id.*) Her chief complaint was her difficulty ambulating due to pain in her lower back and right leg. (*Id.*) She told him that her physical problems began when she was injured in an automobile accident in 2004. (*Id.*) She had suffered from asthma attacks all her life and was diagnosed with diabetes mellitus the previous year. (*Id.*) She also suffered from "migraine headaches" and "constant and progressive pain in her back, legs, and feet." (*Id.*)

Plaintiff told Dr. DeFord that she last worked in April 2007, was currently living with her husband and son, and received her medical treatment at Parkland. (R. at 273–74.) Her symptoms included "difficulty going and staying asleep, chronic pain in her back, legs, and feet, headaches, fatigue, irritability, asthma attacks, shakes, and confusion at times." (R. at 274.) She had good appetite, weighed 231 pounds, was active, sang in her church choir, and spent time with her grandchildren. (*Id.*) On an average day, she woke up at six in the morning, ate breakfast, and did some housework or went back to bed. (*Id.*) She walked about the house, cooked, cleaned, did laundry, talked on the telephone, read the ible, and watched television. (*Id.*) She could drive and

use public transportation independently, but she did not go shopping on her own. (*Id.*) She could pay the bills and balance a checkbook. (*Id.*)

Plaintiff enjoyed talking daily with her husband, her son and daughter—ages 30 and 26, and her five grandchildren. (*Id.*) She left the house on occasion and attended church regularly. (*Id.*) She accepted praise and could handle criticism by "tak[ing] it in stride, consider[ing] [herself], and mov[ing] on." (*Id.*) When she became angry, she "somatize[d], isolate[d] [herself], and [took] medicine." (*Id.*) She always arrived at doctors' appointments on time and took her medicine regularly. (R. at 274–75.) She had experienced no episodes of decompensation and was not destructive when agitated. (R. at 275.) In the past, she worked in a warehouse and as a clerk, a teacher, a teller, a mail clerk, and a customer service representative. (*Id.*) She injured her back, neck, and legs in a vehicle accident in 2004, and was diagnosed with asthma, diabetes mellitus, arthritis, obesity, and acid reflux. (*Id.*) She did not smoke, drink, or use "street drugs." (*Id.*)

In his mental status report, Dr. DeFord noted that Plaintiff was an obese woman. (*Id.*) She was "casually dressed and groomed;" made normal eye contact; walked with a limp and used a cane; spoke with a normal rate and volume and had "little spontaneous speech;" her prosody and gesturing were intact; and she tried to be cooperative but stated that the interview gave her a headache and limited her participation. (R. at 276.) She gave logical, relevant, and coherent answers; had no loose thought associations or paraphrasia; "gave abstract interpretations to proverbs;" denied obsessive thoughts, anhedonia, and auditory and visual hallucinations; had appropriate affect; was sometimes slow in responding; reported no special talents; was "mildly depressed;" and "had much somatic preoccupation." (*Id.*) She "reported no difficulties in concentration or psychomotor agitation," denied suicidal and homicidal thoughts or tendencies, and did not have a history of manic

episodes.  (R. at 277.)  She was oriented to person, place, time, and situation; her memory was "good;" she could remember two or three objects after five minutes without prompting; she could retain and recall five digits forward and backward—which was in the normal range; and her "intelligence [was] estimated as average." (*Id.*)  "She [did] not believe she [had] a mental illness." (*Id.*)  She believed that the "cause of her difficulties ... was the accident" she had in 2004.  (*Id.*)  Dr. DeFord diagnosed her with "pain disorder associated with both psychological factors and a general medical condition," "depressive disorder," obesity, and stress, and assigned her a Global Assessment of Functioning (GAF) score of 55.[5]  (R. at 277–78.)  His prognosis was guarded given her chronic pain and somatic concerns, and he opined that "excessive use of projection would be a challenge to vocational rehabilitation at [that] time."  (R. at 278.)

On April 30, 2008, Robert B. White, Ph. D., a state agency psychological consultant, reviewed Plaintiff's medical records to evaluate her alleged mental limitations and completed a psychiatric review technique form (PRTF).  (R. at 257–70.)  He compared her alleged mental impairments to listings 12.04 for "affective disorders" and 12.07 for "somatoform disorders."  (R. at 257.)  He diagnosed her with depressive disorder without psychotic features, characterized by decreased energy, and with pain disorder, associated with psychological factors and general medical condition.  (R. at 260–63.)  He opined that she had mild limitations in her activities of daily living, social functioning, and in maintaining concentration, persistence, and pace, and had experienced no episodes of decompensation.  (R. at 267.)  He noted that in February 2008, she "reported that she ha[d] no limitations due to any mental or emotional problem[s]."  (R. at 269.)  He referenced Dr. DeFord's April 29, 2008 observations that she was cooperative, mildly depressed, her affect was

---

[5]  A GAF score of 51 to 60 indicates "moderate symptoms or any moderate difficulty in social, occupational, or school functioning."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

appropriate, she reported no concentration difficulties, her memory was adequate, she had no perceptual abnormalities, she was sometimes slow in her responses, and her thought processes were logical, relevant, and coherent.  (*Id.*)  He noted her capacity to engage in activities of daily living, including doing housework and laundry, preparing meals, reading, watching television, driving, using public transportation, paying bills, and handling finances independently.  (*Id.*)  In social functioning, she could get along with her immediate and extended family, attended church, socialized with friends and neighbors, visited with her grandchildren, and sang in her church choir. (*Id.*)  Dr. White concluded that her "alleged limitations [were] not supported by [the medical evidence of record]" because despite "some intermittent problems with feeling overwhelmed," she "ha[d] no more than minimal limitations."  (*Id.*)

On July 1, 2008,  Eric Eisner, M.D., an orthopedic surgeon at Parkland, examined Plaintiff. (R. at 486.)  Dr. Eisner noted her "history of diabetes, hypertension, and asthma," her complaints of bilateral knee pain, and the fact that she walked with a cane.  (*Id.*)  She told him that steroid injections helped relieve the pain in her right knee.  (*Id.*)  Dr. Eisner found she had a "full range of motion" in the right knee, "with crepitance and tenderness along the joint line." (*Id.*)  Her right knee showed "more crepitance" and was "more tender" than the left.  (*Id.*)  She had "no palpable effusion" or "instability in the knees."  (*Id.*)  "She [was] neurovascularly intact in [her] bilateral lower extremities," her "hips [had] [a] full range of motion with no pain," her "back [had] some tenderness to palpitation in the lumbar spine," and she performed a "negative straight leg raise test." (R. at 486–87.)  X-rays taken that day revealed "moderate arthritis in the right knee with some preserved joint space in the lateral compartment but fairly significant joint space decrease in the medial compartment."  (R. at 487.)  Her left knee had "more mild disease" and she had "minimal

- 15 -

degenerative changes in her hips." (*Id.*) Dr. Eisner administered a steroid injection in her right knee and noted that she "had good pain relief after the injection." (*Id.*) He referred her to pool therapy and recommended that she stay on her current medications. (*Id.*)

On June 2, 2009, Plaintiff presented to the office of Robert Bucholz, M.D., an orthopedic surgeon at Parkland. (R. at 463.) She complained that the pain in her back and right knee had increased over the past year and was more severe at night. (*Id.*). She was interested "in going back to summer water aerobics classes, which she did several years ago." (*Id.*) She weighed 222 pounds, was "actively trying to lose weight," and had "lost about 16 pounds in the last year." (*Id.*) Her right knee had a full range of motion but with pain, crepitance, and patellofemoral grind. (*Id.*) Dr. Bucholz opined that X-rays of her right knee showed the "progression of her arthritic disease." (*Id.*) He administered a steroid injection in her right knee and issued referrals for physical therapy and water aerobics. (R. at 463–64.) He opined that she would need a "total knee replacement ... if conservative management fail[ed]." (R. at 464.)

On October 2, 2009, Plaintiff saw a nutritionist at Parkland Nutrition Clinic. (R. at 491.) She weighed 230 pounds, her BMI was 40.42, and her obesity grade was III. (R. at 492.) She reported walking six times a week for 30 to 45 minutes, and although she was referred to a water aerobics class, she did not attend due to transportation problems. (*Id.*) She was making "good" progress toward a positive lifestyle and diet, and she rated her adherence to the program at seven on a ten-point scale. (*Id.*) On November 3, 2009, she returned to Parkland and reported having constant, aching pain in her shoulders for the past two weeks. (R. at 489.) She was unable to lift things due to weakness in her shoulders. (*Id.*)

On January 21, 2010, Plaintiff saw Christie Uzonamaka Eqbuchunam, M.D., at Parkland, for a routine gynecologic exam.  (R. at 45.)  On April 20, 2010, she returned to Parkland for a follow-up with her diabetes, asthma, and hyperlipidemia.  (R. at 22.)  She stated having no symptoms and her blood sugar levels were "consistently in an acceptable range."  (R. at 23–24.)  Her compliance with her treatment for high cholesterol was "excellent."  (R. at 24.)  She exercised intermittently, was "feeling well," and denied any symptoms of cardiovascular disease, such as "chest pain, palpitations, dyspnea, orthopnea, claudication, and peripheral edema."  (*Id.*)  She was alert, cooperative, and was in no distress; her lungs were clear; and her heart had regular rate and rhythm.  (*Id.*)  Her feet were normal and her bilateral shoulder joints had a decreased range of motion but they showed no tenderness, swelling, or redness.  (*Id.*)  Her diabetes was under "excellent control," her LDL cholesterol was "elevated," and her hypertension was "controlled" with medications.  (*Id.*)

### 3.   Hearing Testimony

On November 6, 2009, Plaintiff and a Vocational Expert (VE) testified at a hearing before the ALJ.  (R. at 502–30.)  Plaintiff was represented by an attorney.  (R. at 502.)  At the start of the hearing, her attorney amended the alleged onset date to April 11, 2007.  (R. at 505–06.)

### a.   *Plaintiff's Testimony*

Plaintiff testified that she graduated high school and earned 60 hours of college credit in "childcare."  (R. at 506–07.)  She attended a vocational school in 1978 and earned a certificate as a secretary/receptionist.  (R. at 507.)  She last worked on April 11, 2005.  (*Id.*)  She was born in 1957 and was 52 years old.  (*Id.*)  She received short and long-term disability benefits from Reliance from the time she left her last job until June of 2009.  (R. at 508.)

Plaintiff's employment as a childcare worker involved working with children ages "three to five" and required her "to do lifting." (R. at 509.) Before that, she worked in a call center where she could sit down. (*Id.*) She did not believe she could return to that job because the "long periods of time" sitting down would exacerbate her back and leg pain. (*Id.*) Even sitting down at the hearing before the ALJ caused her pain and made her want to "get up and down." (R. at 509–10.) Sitting caused her extreme pain and "if [she] [sat] anywhere from ten minutes to fifteen minutes, [she] [had] to get up and down, back and forth." (R. at 510.) She did that all day. (*Id.*) She could not sit down and get up every ten or fifteen minutes all day long because of her migraines and the pain in her back and knee. (R. at 511.) Additionally, the pain made it "hard [for her] to concentrate." (*Id.*)

Plaintiff was married and lived with her husband, who did not work. (*Id.*) On a typical day, she woke up at about 7:30 a.m.; she sat for about 10 or 15 minutes before getting up because she got "a little dizzy so [she] ha[d] to wait a little bit before" getting "started." (*Id.*) After doing her "personal grooming," she made breakfast for her and her husband. (R. at 511–12.) She did not know what caused her dizziness in the morning; it could be her medicine or her migraines. (R. at 512.) After breakfast, she would "have to sit a little bit" and then did "a little something in the kitchen," such as washing the dishes. (*Id.*) After that, she sat again for about 15 or 20 minutes and tried "to go in and do a little chore around the house, which consist[ed] of maybe folding some clothes" and putting them away. (*Id.*) She also tried to make the bed but she would "end up going back to it" because of her pain. (R. at 512–13.)

Plaintiff felt constant pain in her knees and back. (R. at 513.) The pain in her knees was "burning [and] aching" and felt "as though somebody ha[d] taken ... nickels and hit [her] knees."

(*Id.*)  The pain in her back felt "just like a stab."  (*Id.*)  Her knees hurt regardless of whether she was sitting or standing.  (*Id.*)  She usually went back to bed after lunch for about an hour and a half.  (R. at 514.)  The prescription medicine she took for her pain made her drowsy, and she sometimes took Tylenol or Advil instead.  (*Id.*)  After waking from her nap, she would "get up then" and "try to get something ready to eat for later."  (R. at 515.)  After that, she tried "to do a few things around the house," such as folding clothes or finishing another task.  (*Id.*)  She could never finish a task at once due to the pain in her right knee and lower back.  (R. at 516.)

Plaintiff began preparing dinner at about 4:00 p.m. and usually ate at 6:00 or 6:30 p.m.  (*Id.*)  She did not prepare elaborate meals because it took a lot of  "time for her" to cook.  (*Id.*)  She usually cooked some kind of meat and a couple of vegetables.  (*Id.*)  In the evening, she watched television or went back to bed.  (*Id.*)  The longest she could stand before having to sit down was five to seven minutes due to the pain in her knees and back.  (R. at 517.)

Plaintiff walked with a cane that a doctor prescribed her because she had "a problem with the walking."  (R. at 518.)  She had not seen that doctor again because now she went "through Parkland [and the other doctor] was through her insurance."  (*Id.*)  She received workers' compensation in the past but was not currently receiving any benefits.  (*Id.*)  She first received workers' compensation benefits in either 2007 or 2009 and received them for one year.  (R. at 519.)

No doctor had recommended surgery for Plaintiff's back pain, but one doctor told her she would probably need surgery in her right knee.  (*Id.*)  She had suffered from migraine headaches since she was a teenager and had them more frequently when she was stressed.  (R. at 520.)  She went to water aerobics class and it helped with her physical problems; it made her feel warm and helped her function with less pain in her knees.  (*Id.*)  However, she did not find it helpful enough

to enable her to return her former "telephone job." (R. at 520–21.) She went to water aerobics three times per week and could not afford to go more often because "the income was so slim." (R. at 521.) She and her husband lived on his social security benefits. (*Id.*) She weighed 220 pounds and was told by physicians to lose weight; she had lost about 12 pounds in the last six months. (*Id.*)

Plaintiff's "concentration [was] off"; in the past, "on the type[s] [of] jobs [she] had, [she] was functional [and] ... could concentrate well, but [currently], since having the pain, [her] concentration [was] off." (R. at 522.) She "tend[ed] to be dizzy" and was constantly "up and down, back and forth." (*Id.*) She was also constantly nauseous, "like right [then]," she was "struggling with just th[e] hearing." (*Id.*)

Plaintiff did not attend church services as often as she used to; now she only attended and sang in the choir every other week. (R. at 522–23.) She went to choir rehearsal with her friend every other week. (R. at 523.) She had a driver's license and could drive. (*Id.*) She did not attend other church activities, such as Bible study and women's group, because her knee pain worsened in the past year. (R. at 523–24.) She handled the finances in her household and went grocery shopping with her husband and her daughter. (R. at 24.) Her daughter and grandchildren visited once or twice a week. (*Id.*) Sometimes she and her husband babysat their grandchildren while her daughter ran errands. (*Id.*) She socialized with friends, neighbors, and people she knew from church; they came to visit or talked on the phone. (*Id.*) She had no problems getting her medications. (*Id.*)

### c. *Vocational Expert testimony*

A vocational expert (VE) also testified at the hearing. (R. at 525–30.) He testified that Plaintiff's past work history included jobs as a childcare attendant (light, semi-skilled, SVP-3), a

customer service clerk (sedentary, skilled, SVP-5), and a bank teller (light, semi-skilled, SVP-3). (R. at 526–27.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work history could perform her past relevant work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six of eight hours; sit for six of eight hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance or crawl; occasionally crouch or kneel; and limited to unskilled work.  (R. at 527.)  The VE testified that the hypothetical person could not perform Plaintiff's past relevant work because it all rated at the semi-skilled or skilled levels.  (*Id.*)  He testified that the hypothetical person could perform some light and unskilled occupations, such as an office or mail clerk (SVP-2), with 130,000 jobs in Texas and 1,300,000 jobs in the national economy; assembler, with 40,000 jobs in Texas and 400,000 in the national economy; and packer, with 60,000 jobs in Texas and 600,000 in the national economy.  (*Id.*)

In response to counsel's question, the VE testified that if the hypothetical person "had to lay down midday on average of an hour to an hour and a half due to pain," this "would preclude competitive employment."  (R. at 529.)  In response to a question by the ALJ, the VE stated that his testimony did not conflict with the dictionary of occupational titles (DOT).  (*Id.*)

C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on February 5, 2010.  (R. at 74–82.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 31, 2004.[5]  (R. at 76.)  At step two, she determined that Plaintiff had two

---

[5]  Plaintiff had amended her alleged onset date to April 11, 2007, at the hearing before the ALJ.  (505–06.)

severe impairments: osteoarthritis and degenerative joint disease. (*Id.*)  Despite those impairments, at step three, she found that no impairment or combination of Plaintiff's impairments satisfied the criteria of any impairment listed in the social security regulations.  (R. at 77.) The ALJ next determined that Plaintiff retained the following RFC: lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull 10 pounds frequently and 20 pounds occasionally; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance or crawl; occasionally kneel and crouch; and limited "to unskilled work in consideration of residual pain and mild psychological symptoms." (R. at 78.)  At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work.  (R. at 81.)  At step five, with the testimony of the VE, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, such as office clerk, with 130,000 positions in Texas and 1,300,000 in the national economy, assembler, with 40,000 positions in Texas and 400,000 in the national economy, and packer, with 60,000 positions in Texas and 600,000 in the national economy.  (R. at 82.) Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time between her alleged onset date and the date of the ALJ's decision.  (*Id.*)

## II.  ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Therefore, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id*.

**2.      Disability Determination**

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at

any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813

F.2d 55, 58 (5th Cir. 1987).

**B.**     <u>**Issues for Review**</u>

Plaintiff presents the following issues for review:

(1)     The ALJ without good cause, failed to consider and weigh the opinion of
Hawkins' treating physician, Lauri Ballard, M.D., dated May 27, 2009.[5]

(2)     The ALJ determined that her RFC was more restricted than the State Agency
Medical Consultants', but without discussion rejected their opinion of Hawkins'
limited ability to be on her feet throughout the workday.

(3)     These errors led to an unsupported hypothetical question to the vocational expert.
Substantial evidence does not support any conclusion of other work at step 5 if
the vocational expert was not given all of Hawkins' limitations.

(4)     Hawkins was prejudiced by these errors.

(Pl. Br. at 2.)

**C.**     <u>**Treating Physician Rule**</u>

Plaintiff first argues that remand is required because the ALJ improperly rejected Dr.

Ballard's statement to Reliance that she had a moderate limitation of function and could perform

only sedentary work without employing the six-factor analysis found in 20 C.F.R. §§ 404.1527(c)

and 416.927(c).  (Pl. Br. at 15–27.)

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence. 20 C.F.R. § § 404.1520b(b) and 404.1527(c) (2012). Every medical

opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight

---

[5]     Although listed separately, Plaintiff briefed her first and second issues in the same section, encompassed
within her additional argument that the ALJ's RFC assessment was "legally deficient" and not supported by
substantial evidence.  Because each of these arguments requires a different analysis, the Court addresses them
separately.

to opinions from a treating source. 20 C.F.R. § 404.1527(c)(1) (2012).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  20 C.F.R. § 404.1527(c) (1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion

of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis in *Newton*). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, in assessing Plaintiff's RFC, the ALJ considered Dr. Ballard's May 2005 observations that her "lungs ... were clear to auscultation bilaterally with no wheezes, rales, or rhonchi and [had] no neurological abnormalities" and that she had "no specific chronic joint pain, but [only] 'all over soreness with weather changes' since being [involved] in a motor vehicle accident in December 2004." (R. at 79, 362.)  The ALJ noted her statement to Dr. Ballard that she was doing well on June 10, 2005.  (R. at 79, 357.)  She also referenced the exercise stress test using Bruce protocol, conducted on July 26, 2005, upon Dr. Ballard's order, that "revealed no abnormalities." (R. at 79, 357.) The ALJ concluded that those findings, coupled with Plaintiff's lack of treatment until August 2006, did "not suggest symptoms that would have precluded [her] from working since December 31, 2004, her alleged onset date." (R. at 79.)  Referencing treatment records from 2007 indicating that Plaintiff was primarily treated for asthma and diabetes during that time, "impairments that were relatively stable with medication," the ALJ determined that she did not have "a physical impairment that would preclude competitive work."  (R. at 80.)

Although she did not do so explicitly, the ALJ was entitled to reject Dr. Ballard's statement to Reliance that Plaintiff had a moderate limitation of function and could perform only sedentary

work because the ALJ had the sole responsibility of determining Plaintiff's RFC.  *See Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985) (holding that the ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity").  To the extent that Dr. Ballard opined that Plaintiff was disabled, the ALJ could also reject such an opinion because determination of disability is not a medical opinion, but rather a legal conclusion that is reserved for the Commissioner.[6] 20 C.F.R. § 404.1527(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

The ALJ could also reject Dr. Ballard's opinions about Plaintiff's allegedly disabling back pain and osteoarthritis in her right knee without performing a factor by factor analysis because there was competing first-hand medical evidence, including Dr. Eisner's (a Parkland orthopedic surgeon) finding that she had a full range of motion in her right knee in April 2008; Dr. Moody's (a neurosurgeon) observations that she could flex, laterally bend, twist, easily stand on her heels and toes, squat, and perform straight leg raises; and Dr. Bucholz's (an orthopedic surgeon), and Dr. Eisner's findings that Plaintiff's right knee pain was relieved with steroid injections.  *See Newton,* 209 F.3d at 455 (the ALJ has discretion to weigh the evidence of record); (*see also* R. at 327, 463, 486).   Any opinion by Dr. Ballard that Plaintiff's right knee pain was disabling was further contradicted by Plaintiff's statements to Dr. Berry that her right knee pain was relieved with Celebrex and steroid injections. (R. at 386).  Lastly, the ALJ could reject Dr. Ballard's statement that Plaintiff had a "history of lumbar radiculopathy" because Dr. Post, a SAMC, concluded, based on Dr. Zasterova's consultative findings that there was "no evidence of radiculopathy" in her back.  (R. at 297).  *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (holding that the ALJ may

---

[6]  Plaintiff argues that given her age, education, and work experience, pursuant to the Medical-Vocational "Grid Rule" 201.14, an RFC assessment that she could only perform sedentary work would compel a finding of disability. (Pl. Br. at 30–31.)

accept a consulting physician's opinion that is well-supported by the record over a treating physician's opinion).  The ALJ's rejection of Dr. Ballard's opinions to Reliance was not erroneous and is supported by substantial evidence.  Remand is therefore not required on this issue.

**D.      State Agency Medical Consultants' Opinion**

Plaintiff contends that in assessing her physical RFC, the ALJ improperly rejected Dr. Post's opinion that she "could only be on her feet to stand and walk 2 hours in an 8 hour workday" without any discussion and without considering the six factors outlined in 20 C.F.R. §§ 404.1527(c) and 416.927(c).[7]  (P. Br. at 16–17, 23–25.)

State agency medical consultants (SAMCs) such as Dr. Post are considered experts in Social Security disability determination, and their opinions may be entitled to great weight if they are supported by the evidence.  *Hardin v. Astrue*, No. 3:10-CV-1343-B BH, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *recommendation adopted*, 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). Although an ALJ is solely responsible for assessing the claimant's RFC, she must consider and discuss any assessment of the claimant's RFC by an SAMC.  *See* Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996).  Specifically, "RFC assessments by [SAMC's] … are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors … for considering opinion evidence" outlined in 20 C.F.R. § 404.1527(c).  *Id.*  Moreover, unless a treating physician's opinion is given controlling weight, the

---

[7] Plaintiff also argues that the ALJ committed the same error with respect to Dr. Cremona's opinion.  (Pl. Br. at 15, 17, 24.)  Dr. Cremona's "opinion" consists only of a one-page checklist where he indicated that he "reviewed all the evidence in [the] file" and "affirmed as written" Dr. Post's physical RFC assessment.  (*See* R. at 271.)  Accordingly, the analysis that applies to Dr. Post's opinion also applies to Dr. Cremona's.

ALJ "must explain in [her] decision the weight given to the opinions of a [SAMC] …, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining source." 20 C.F.R. § 404.1527(e)(2)(ii) (2012); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003).   Nonetheless, the ALJ is not required to expressly discuss each finding by an SAMC or discuss each factor listed in 20 C.F.R. § 404.1527(c), because such a detailed analysis is necessary only when the ALJ rejects a treating source's opinion. *See Newton*, 209 F.3d at 456–58.

In assessing Plaintiff's RFC, the ALJ "considered [the] opinion evidence in accordance" with the regulations.  (R. at 78.)  She relied on treating physicians' diagnoses and observations to find that Plaintiff was capable of performing light work, but she did not give controlling weight to the opinion of any particular treating physician.  (*See* R. 79–82.)  Accordingly, pursuant to 20 C.F.R. § 404.1527(e), she was required to discuss in her decision the weight she gave to Dr. Post's physical RFC assessment.  *See* 20 C.F.R. § 404.1527(c); *Alejandro*, 291 F. Supp. 2d at 515.

Although the ALJ did not explicitly reference Dr. Post's RFC assessment by name, she explained that her RFC assessment "differ[ed] from the opinion of the State Agency physician, who found [Plaintiff] could perform all postural maneuvers on an occasional basis."  (R. at 80.)  In contrast to Dr. Post's findings, the ALJ's RFC assessment gave Plaintiff "the benefit of the doubt" regarding her allegation that she had "problems with balance loss [and] vertigo" with the limitation that she "could not climb ladders/ropes/scaffolds, balance, or more than occasionally climb ramps and stairs."  (*Id.*)  The ALJ also stated that her determination was based "on updated evidence that was not available for review by [Dr. Post]" and on "a different interpretation" of the evidence that Dr. Post did review.  (R. at 81.)  Although not in a formalistic fashion, the ALJ explained her decision for giving little or no weight to Dr. Post's RFC findings as she was required by the

regulations, and she therefore committed no reversible error.  Accordingly, remand is not required on this issue either.

## E.   RFC Determination

Plaintiff also argues that remand is required because the ALJ's RFC determination is "legally deficient and substantial evidence does not support [her] finding that [Plaintiff] [could] be on her feet either standing or walking for 6 hours in an 8-hour workday."  (P. Br. at 14, 26–27.)  She contends that the ALJ improperly used "her lay opinion" to interpret raw medical records after she rejected the only medical opinions regarding her ability to stand and walk.  (*Id.* at 26.)[8]

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no

---

[8]   In her third issue, Plaintiff argues that the ALJ's improper rejection of Dr. Ballard's exertional level opinion and Dr. Post's RFC opinion resulted in a defective hypothetical to the VE.  This issue is subsumed in the RFC determination issue because the ALJ's hypothetical tracked her RFC assessment.  (*See* R. at 527.)  In her fourth issue, Plaintiff argues that the ALJ's failure to adopt these physicians' opinions prejudiced her claim.  This issue is also subsumed in the RFC determination issue.  Accordingly, these issues are addressed together.

information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

After making a credibility finding regarding Plaintiff's alleged symptoms and limitations and reviewing "the objective medical evidence and other evidence," the ALJ determined that she had the following RFC: lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull 10 pounds frequently and 20 pounds occasionally; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance or crawl; occasionally kneel and crouch; and limited "to unskilled work in consideration of residual pain and mild psychological symptoms." (R. at 78.) In determining Plaintiff's physical RFC, the ALJ noted that MRI impressions showed "only mild to

moderate degenerative changes" in her back, X-rays of her knees revealed "no abnormalities," and by December 19, 2006, she could "flex, laterally bend, twist, easily stand on heels and toes, squat, and perform straight leg raises" despite her obesity.  (R. at 79, 320, 327, 339.)  The ALJ acknowledged Plaintiff's allegations to Dr. Freeze on September 7, 2006, that she had "ongoing problems with [a] general pulling sensation," "lower abdominal pain at times," her "legs [felt] like [it was] hard to walk in mid thigh to knee area," and she had "severe lower back pain." (R. at 76, 349.)  The ALJ noted her statement to Dr. Ballard, her primary care physician, that she "was working at a daycare, where she was required to lift small children."  (R. at 79, 344.)  She pointed to Dr. Moody's opinion during his initial consultation that in two weeks, Plaintiff "could return to her job as a child care attendant, a position [that] the vocational expert testified would require light exertion."  (R. at 79–80, 327, 526.)

The ALJ also relied on the April 2008 treatment notes from Dr. Eisner, a Parkland orthopedic surgeon, indicating that Plaintiff's right knee pain improved with steroid injections, as well as on Dr. Zasterova's consultative observations that Plaintiff had "only [a] slightly diminished range of motion in [her] lumbar spine and a slow, antalgic gait, but normal station," had "intact muscle strength/reflexes, no signs of atrophy, and an ability to move about the examination room without the aid of an assistive device." (R. at 80, 305–07.)  She considered treatment records from 2007 that showed Plaintiff "was primarily seen [for] follow-up [with] [her] asthma and diabetes mellitus, impairments that were relatively stable with medication."  (R. at 80.)

The ALJ also considered Plaintiff's activities of daily living.  (R. at 78–81.)  She noted that despite Plaintiff's testimony that she was "unable to work since April 11, 2005, due to chronic back pain ... [and] migraine[s]," she "testified [that] she [was] able to prepare her own breakfast and

- 33 -

lunch," and "nap[ped] for 90 minutes" after every meal.  (R. at 78, 510, 514.)  She pointed to her statements to Dr. DeFord, a psychological consultant, that she could do household chores, was "active in church," and had "an ongoing ability to manage household bills/finances, grocery shop with her husband, and visit/babysit her grandchildren ... twice a week."  (R. at 79, 273–74.)  She noted Plaintiff's testimony that she went to water aerobics three times a week.  (R. at 79.)  The ALJ could consider Plaintiff's day-to-day activities as long as she did not place "exclusive reliance on daily activities" in determining disability.  *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).

Based on the evidence she cited, the ALJ determined that Plaintiff "could perform the demands of a limited range of light work, as long as it required only occasionally climbing ramps/stairs, kneeling, and crouching and no crawling."  (R. at 80.)  Notably, even though various treating and examining physicians noted Plaintiff's ability to walk without assistance, squat, twist, and do sitting straight leg raises, none gave an opinion about her ability to stand for an extended period except Dr. Post and Dr. Ballard.  Because the ALJ implicitly rejected Dr. Post's and Dr. Ballard's opinions, she relied on her own lay interpretation of Plaintiff's medical and other evidence to find that she could stand for six hours of an eight-hour workday.  (*See* R. at 78.)  Accordingly, the ALJ committed error.  *See  Davis v. Astrue*, No. 1:11CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012), *recommendation adopted*, 2013 WL 28068 (N.D. Miss. Jan. 2, 2013) ("In formulating a claimant's RFC, the ALJ—a layperson—may not substitute his own judgment for that of a physician."); *see also Frank*, 326 F.3d at 622; *West v. Sullivan,* 751 F. Supp. 647, 648 (N.D. Tex. 1990).

Nevertheless, "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected."  *Mays v.*

*Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  Because an RFC determination can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that she rejected, and because she was entitled to reject Dr. Ballard's opinion about the exertional level of work that Plaintiff could perform, Plaintiff must show that she was prejudiced by the ALJ's rejection of Dr. Post's RFC standing limitation.  "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  To establish prejudice, Plaintiff must show that the ALJ's adoption of Dr. Post's opinion might have led to a different decision of disability.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Newton*, 209 F.3d at 458).

The medical evidence before the ALJ showed that Plaintiff was diagnosed with "moderate arthritis in the right knee," a progressive disease.  (R. at 318, 344, 463, 487).  X-rays and MRI impressions showed she had degenerative disc changes and joint disease in her lower back.  (R. at 307, 327, 337.)  While Plaintiff reported that steroid injections relieved the pain in her right knee, she repeatedly complained of increasingly severe lower-back pain.  (*See* R. at 273, 304–05, 323, 330, 346, 463, 486–87.)  In June 2009, Dr. Bucholz, a treating orthopedic surgeon, opined that Plaintiff would need a "total knee replacement" if conservative treatment proved ineffective.  (R. at 464.)  This evidence supported Dr. Post's conclusion that Plaintiff could stand for two of eight hours.  The ALJ did not discuss this evidence in her narrative discussion.

If the ALJ had adopted Dr. Post's standing limitation, which was supported by the record, her RFC assessment would have led to a finding that Plaintiff could only perform sedentary work,

which requires only occasional walking and standing as "necessary in carrying out job duties."  20

C.F.R. § 404.1567(a) (2012.)  Had the ALJ included this RFC assessment in her hypothetical to the

VE, a different determination would have been reached as to Plaintiff's ability to perform the jobs

of office clerk, assembler, and packer, which the VE testified were "light" and unskilled.  (R. at

527.)  Alternatively, if the ALJ had determined that Plaintiff had the RFC to perform only sedentary

work and considered that along with Plaintiff's age, education, and work experience, she would have

concluded that Plaintiff was disabled pursuant to medical-vocational guidelines "grid rule" number

201.14.[9]  Remand is required because the ALJ's rejection of Dr. Post's RFC opinion prejudiced

Plaintiff's claim.

## III.  RECOMMENDATION

Plaintiff's motion should be **GRANTED in part**, Defendant's motion should be **DENIED**

**in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

---

[9]  To guide the determination of whether other work exists that a Social Security claimant can perform, the Commissioner promulgated medical-vocational guidelines (Grids).  *Smith v. Astrue*, No. CIVA 3:08-CV-1241NBH, 2009 WL 1203407, at *9 (N.D. Tex. May 1, 2009).  The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008).  If the claimant's impairments are solely exertional or the nonexertional impairments do not sufficiently affect the claimant's RFC, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  Because "[i]ndividuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work," when they "can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." 20 C.F.R. Pt. 404, Subpt. P, App. 2(g).  Moreover, listing 201.14 directs a finding of disability when an individual who is "closely approaching advanced age" and has at least a high school degree is limited to unskilled sedentary work. *See id.*

**SO RECOMMENDED** on this 11th day of March, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 37 -